Douglas R. Luther (SBN 280550)
dluther@lutherlanard.com
S. Ryan Patterson (SBN 279474)
rpatterson@lutherlanard.com
LUTHER LANARD, PC
4675 MacArthur Court, Suite 1240
Newport Beach, California 92660
Telephone: (949) 649-4241

Attorneys for Petitioners Alexander Zaltsman; Fitwell License Holdings, LLC; XPO Fitness Operator, LLC; RH Ventures II, LLC; and PB Ventures I, LLC

UNITED STATES DISTRICT COURT FOR THE

CENTRAL DISTRICT OF CALIFORNIA

| ALEX ZALTSMAN; FITWELL LICENSE HOLDINGS, LLC; XPO FITNESS OPERATOR, LLC; RH VENTUES II, LLC; and PB VENTURES I, LLC, <br><br> Petitioner, <br><br> v. <br><br> XPONENTIAL FITNESS, LLC, <br><br> Respondent. | CASE NO.: <br><br> **PETITION TO COMPEL ARBITRATION** |
|---|---|

PETITIONERS ALEX ZALTSMAN ("Zaltsman"); FITWELL LICENSE HOLDINGS, LLC; XPO FITNESS OPERATOR, LLC; RH VENTUES II, LLC; and PB VENTURES I, LLC, by and through their attorneys, Luther Lanard PC, for their Petition to Compel Arbitration against RESPONDENT XPONENTIAL FITNESS LLC ("Xponential" or "Respondent"), allege, on knowledge as to their own actions, and otherwise upon information and belief, as follows:

**INTRODUCTION**

1. Petitioners are franchisees and Respondent is a franchisor. On February 26, 2025, Petitioners demanded arbitration against Respondent and Respondent's affiliates Row House Franchising, LLC and PB Franchising, LLC (collectively, the "Affiliates") pursuant to the mandatory arbitration clauses in the parties' franchise agreements. [See, Exh. C.]

2. Arbitration pursuant to Petitioners' demand commenced on May 1, 2025: American Arbitration Association Case Number 01-25-0001-1348 (the "Arbitration"). The Affiliates have appeared in the Arbitration, but Respondent Xponential Fitness, LLC has refused to participate on the grounds that it was not a party to any arbitration clause with Petitioners.

3. Petitioners seek an order from this court under the Federal Arbitration Act (9 U.S.C. § 4) compelling Respondent to arbitrate a dispute between the parties in accordance with the terms of the parties' franchise agreements.

**THE PARTIES**

1. Petitioner Alex Zaltsman is an individual who resides in Short Hills, New Jersey. Zaltsman owns and operates five Row House franchises across New Jersey, New York, and Connecticut. He also owns and operates a Pure Barre franchise in New Jersey.

2. Petitioners Fitwell License Holdings, LLC; XPO Fitness Operator, LLC; RH Ventures II, LLC and PB Ventures I, LLC are entities that Zaltsman owns his Row House franchises and Pure Barre franchise through, all of which he is the sole member.

3. Respondent Xponential Fitness, LLC is a Delaware limited liability company with a principal business address at 17877 Von Karman Avenue, Ste. 100, Irvine, California. Xponential Fitness, LLC is a franchisor of health and wellness brands, including Row House and Pure Barre.

4. At all times relevant to this Petition, Respondent Xponential Fitness, LLC has controlled its affiliates Row House Franchise, LLC and PB Franchising, LLC such that Xponential Fitness, LLC is liable for the actions of Row House Franchise, LLC and/or PB Franchising, LLC. While the corporate structure has changed over the years, Xponential Fitness, LLC has always maintained sole control over these affiliates—for example:

a. From 2017 through March 2023, Xponential Fitness, LLC was the sole member of Row House Franchise, LLC and PB Franchising, LLC; and

b. From March 2023 to the present, Xponential Fitness, LLC is the sole member of XPOF Assetco, LLC, an entity formed in March 2023 that is the sole member of Row House Franchise, LLC and PB Franchising, LLC.

5. Row House Franchise, LLC and PB Franchising, LLC share a principal address with Respondent Xponential Fitness, LLC: 17877 Von Karman, Ste. 100, Irvine, CA 92614. [See, e.g., Exh. A, p. 37, § 17.4 (requiring notices to be sent to Row House Franchise, LLC care of Xponential Fitness LLC at the same address in Irvine, California).]

6. Additionally, Row House Franchise, LLC's 2022 Franchise Disclosure Document, explicitly identifies Respondent as the parent company of Row House Franchise, LLC.

7. Under the facts and circumstances giving rise to Petitioners' claims in the Arbitration, it would be inequitable, and result in a manifest injustice if Respondent Xponential Fitness, LLC were permitted to avoid participating in the Arbitration.

**JURISDICTION AND VENUE**

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between citizens of New Jersey and citizens of California, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. Venue is proper in this judicial district because, pursuant to 9 U.S.C. § 4, a party should bring a petition to compel arbitration in the District where the parties agreed to arbitrate any disputes between them. The parties agreed to bring any arbitration of a dispute in Orange County, California. [See, e.g., Exh. A, p. 33 § 16.4 (requiring arbitration in Irvine, California).]

**FACTUAL BACKGROUND**

8. The Franchise Agreements governing Zaltsman's five Row House franchises all contain substantively identical provisions requiring mandatory arbitration. The mandatory binding arbitration provision states (in relevant part):

> All Claims shall be submitted to and resolved by binding arbitration that will take place at Franchisor's or, as applicable, Franchisor's successor's or assign's, then-current principal place of business (currently, Irvine, California) or another location that

3
PETITION TO COMPEL ARBITRATION

Franchisor designates, before the AAA and in accordance with AAA's then-current Commercial Arbitration Rules.

[Exh. A, p. 33, § 16.4]

9. The Franchise Agreement governing Zaltsman's Pure Barre franchise contains a nearly identical provision that requires mandatory arbitration. This provision states (in part):

All Claims shall be submitted to and resolved by binding arbitration that will take place at Franchisor's headquarters or other location that Franchisor designates in Irvine, California, before and in accordance with the arbitration rules of the American Arbitration Association. Judgment upon the award rendered by the arbitrator shall be entered in any Court having jurisdiction thereof.

[Exh. B, p. 32, § 16.4]

## Row House

10. In September 2018, Zaltsman became interested in the Row House franchise brand. Xponential Fitness, LLC ("Xponential") was the parent company to Row House Franchise, LLC and Row House Franchise SPV, LLC ("Row House").

11. In September 2018, Xponential, through its franchise broker St. Gregory Group, provided promotional information about Row House that included financial performance representations claiming the average revenue of a Row House franchised business was $796,748.

12. To further entice Mr. Zaltsman to join the franchise, Xponential gave him the 2018 Franchise Disclosure Document (2018 FDD). Item 19 of the 2018 FDD supported the marketing materials, claiming an average gross revenue of $796,748.23 of its two New York studios, with the two studios earning gross revenues of $975,530.62 and $617,965.83 respectively.

13. Enticed by financial performance representations in the 2018 FDD, Mr. Zaltsman went to the Row House Discovery Day event in Irvine, California in October 2018. There, Mr. Zaltsman met Ramon Castillon (then President of Row House) and Anthony Geisler (then Chief Executive Officer of Xponential), both of whom, along with others, continued to tout the Row House franchise opportunity. After talking with Castillon, Row House employees, and members of Xponential, and after reviewing the 2018 FDD, Mr. Zaltsman was convinced in the Row House opportunity.

14. On November 2, 2018, Mr. Zaltsman signed a Franchise Agreement with Row House for the right to run a franchised business in Morristown, New Jersey. Also on November 2, 2018, Mr. Zaltsman signed an Area Development Agreement (ADA), in which he agreed to open three (3) Row

House studios within 18 months. He paid $125,000 as a development fee in connection with the Area Development Agreement.

15. After purchase of the initial franchise in Morristown, Mr. Zaltsman acquired five Row House studios:

- Row House Montclair, 638 Bloomfield Ave, Montclair, NJ 07042 acquired from IPR Capital, LLC on January 27, 2022. Mr. Zaltsman paid $105,204.75 for this franchise.
- Row House Jersey City, 70 Hudson Street, Jersey City, NJ 07302 acquired from Strack TBC, LLC on March 26, 2022. Mr. Zaltsman paid $21,001 for this franchise.
- Row House Stamford, 5 Broad Street Stamford, CT 06901 acquired from Stamford Row, LLC on July 20, 2022. Mr. Zaltsman paid $10,001 for this franchise.
- Row House Chelsea, 269 W. 23rd Street, New York, NY 10011 acquired from RH Franchise, LLC on May 26, 2023. Mr. Zaltsman paid $100 for this franchise.
- Row House E34, 233 E. 34th Street, New York, NY 10016 acquired from RH Franchise, LLC on May 26, 2023 Mr. Zaltsman paid $100 for this franchise.

16. The purchases of these Row House franchises were based on information at the 2018 Discovery Day and information in the 2018 FDD and subsequent FDDs given to Mr. Zaltsman by Xponential. Mr. Zaltsman was optimistic that there was a chance to generate the revenues disclosed in the 2018 FDD in the post-pandemic market, and the 2021 Row House FDD claimed the Chelsea Studio generated $703,922 in direct revenue in the 2019 calendar year. In reliance on these numbers, Mr. Zaltsman acquired more studios.

17. On August 20, 2021, Row House, via Evan Hearnsberger (General Counsel for Xponential and attorney for Row House), served Mr. Zaltsman with a Notice of Default due to Mr. Zaltsman's alleged failure to open and operate three (3) Row House studios by the deadlines in the ADA. Row House extended the ADA deadline to November 8, 2021 and advised Mr. Zaltsman that failure to open and run the three Row House studios by that time could result in termination of the ADA. After receipt of the default notice, Mr. Zaltsman emailed Jason Losco (then Xponential's Executive Vice President of Franchise Development) to ask for help. Losco told Mr. Zaltsman to discuss the default notice with Ramon Castillon (then Row House President). Mr. Zaltsman discussed

the default notice with Castillon, who directed Mr. Zaltsman Row House would not enforce the ADA's obligations and that they would check in every six months.

18. There were no additional threats or notices of default per Mr. Zaltsman's and Castillon's conversation in or around August 2021, and Mr. Zaltsman was permitted to acquire additional Row House studios in 2022 and 2023. Mr. Zaltsman ran the Row House studios he acquired in 2022 and 2023 to the best of his abilities. However, on May 16, 2024, Evan Hearnsberger served a Notice of Termination of the Area Development Agreement and the Franchise Agreement.

## Row House–Misrepresentations and/or Omissions

19. In May 2023, Mr. Zaltsman acquired the Row House Chelsea in New York, one of the original Row House studios included on the 2018 FDD. In 2024 after reviewing the Row House Chelsea financials that included the records from Class Pass, Mr. Zaltsman discovered that the 2018 FDD (and, without limitation, the 2021 Row House FDD) have false or misleading statements in the Item 19 Financial Performance Representations.

20. Specifically, the Item 19 Financial Performance Representations in the 2018 FDD omit that Studio Number 1 in the FDD (which is the Row House Chelsea studio) earned $601,959 of its reported $975,530 gross revenue from Class Pass and only $373,571 from its own efforts, branding, business systems, goodwill, methodology, etc. If Class Pass had not referred $601,959 of business, "Covered Studio 1" would show a net loss of $35,185 rather than a $338,386 gross profit, effectively making Row House a money losing and unsellable business as a franchise, or otherwise. Similarly, Item 19 in the 2021 FDD inflated the earnings of the Chelsea studio. The 2021 FDD reported $703,922 in revenue but failed to disclose that $177,942 of that revenue (about 25%) came from Class Pass.

21. The outrageousness of the 2018 FDD's financial representations are further established by the poor (but realistic) performances of Row House studios across the country. Based on information provided to Mr. Zaltsman in May of 2024, as of May 2024 eighty (80) of ninety-one (91) Row House studios never achieved the pre-Class Pass revenues that XPO claims Chelsea made in the 2022 FDD, and zero (0) Row House studios ever achieved the $975,530 that "Covered Studio 1" achieved.

22. Xponential's failure to disclose Class Pass's impact on the financial representations is a material omission that makes the 2018 FDD misleading. About 61% of the revenue of "Covered

Studio 1" came from Class Pass. It is clear now that "Covered Studio 1" needed Class Pass and its referrals to survive. That Class Pass and its referrals were essential to the success of Covered Studio 1 is highly problematic, as Xponential / Row House have no control over and no business relationship with Class Pass customers, and, therefore, Xponential / Row House have no ability to reliably reproduce the revenue brought in by Class Pass on a month to month or year to year basis. Class Pass is uniquely available to metro locations and would not have had the same effect at studios outside of the typical Class Pass user's location. Failure to reveal such a massive input of business that is unreliable and out of the prospective franchisee's control is a glaring and material omission. Had Mr. Zaltsman known that 61% of the revenue of the business in the Item 19 disclosure came from a singular referral service, he never would have entered into the franchise agreement.

23. In addition to the glaring misrepresentation or omission in the Item 19 disclosure, Row House knowingly misrepresented or omitted (without limitation):

    a. <u>Lack of support</u>. Despite promises of support, Row House provided little to no training or guidance. No support was provided in hiring so called "studio managers," leaving franchisees trying to retrofit people from other careers into studio managers or further requiring franchisees to run their own studios with no pay;

    b. <u>Unsustainable marketing strategy</u>. Row House's marketing strategy is and was entirely reliant on expensive digital marketing that is highly unpredictable and volatile. It requires spending thousands of dollars on digital ad spends and hiring expensive marketing companies that have failed franchisees repeatedly. Franchisees like Mr. Zaltsman spend thousands to generate few realistic potential customers;

    c. <u>Lack of adaptability.</u> Row House never enjoyed success and despite continued failures and closings, Row House never changed strategies. Instead, Row House continued to push and focus on selling a service that was unprofitable, unsustainable, and not well received in the market;

    d. <u>Lack of area development process</u>. Xponential offers ADAs but offers no training or guidance on how to open new studios or how to operate multiple studios;

e. <u>Lack of disclosure of high rates of attrition</u>. The Row House studio model results in high rates of attrition, resulting in an endless cycle of selling new memberships and losing old customers. The high rates of attrition were known, but not disclosed, by Xponential;

f. <u>Misrepresentations related to available labor resources</u>. In franchise marketing materials and throughout Discovery Day, Row House claimed its franchisees would be able to use Xponential's "Executive Model" to operate its businesses. In other words, Xponential stated that in their system, a franchisee needed only to hire "general managers" and part-time sales staff to operate the franchises with franchisee owners taking the role of business leaders. This was false, and Row House intended to induce Zaltsman (and other franchisees) into spending significant monetary resources on multiple studios under the belief that multiple general managers could run the multiple studios. In reality, the labor force promised by Row House does not exist and franchisees like Zaltsman are required to seek out and hire people with no experience or expertise in fitness studio sales. This process repeatedly failed, and continues to fail, leading franchisees like Zaltsman essentially to assume roles that they didn't consent to (and without pay) when purchasing the franchise opportunity. The damages are multiplied when owning more than one unit; and

g. <u>Continued lack of support following sale of Row House brand to Extraordinary Brands, LLC in May 2024.</u> On or around May 21, 2024, XPO sold the Row House brand to an entity owned by RH Franchising, LLC, whose sole parent is Extraordinary Brands, LLC. On information and belief, Xponential sold the brand to RH Franchising, LLC for zero dollars ($0) and pre-acquisition legal protection. Since the sale, little to no support has been provided to Zaltsman (or other franchisees, on information and belief) despite the new corporate ownership's continued recoupment of royalties and other fees.

**Pure Barre**

24. On March 31, 2019, Mr. Zaltsman entered into a franchise agreement with PB Franchising, LLC to open and operate a Pure Barre studio in New Jersey. Mr. Zaltsman paid a $60,000

franchise fee per the Pure Barre franchise agreement. In 2019, like Row House, Xponential was Pure Barre's parent company.

25. Pure Barre, primarily through Sara Luna (then President of Pure Barre and later President of Xponential) and Jason Losco (Executive Vice President of Franchise Development) advised Mr. Zaltsman that a Pure Barre studio location at 1150 Town Center Drive, Livingston, New Jersey 07039 was viable despite the close proximity (less than ten miles) of four other Pure Barre studios. Relying on this advice, Mr. Zaltsman entered into the franchise agreement to open and operate a Pure Barre studio at the Livingston location.

**Pure Barre–Misrepresentations**

26. From the start, the Livingston Pure Barre struggled to attract enough customers to gain a membership. Mr. Zaltsman soon learned that Pure Barre's (primarily through Losco and Luna's) misrepresentations that Mr. Zaltsman's Livingston Pure Barre could be financially viable despite heavy market saturation was a lie. The Livingston Pure Barre location struggled to gain business from its opening in 2019 through March 2020, when the Covid-19 Pandemic caused the studios to shut down.

27. In or around the spring of 2021, the landlord of the studio threatened to evict Mr. Zaltsman. Faced with eviction, Mr. Zaltsman had multiple discussions with Regan Stokes (then president of Pure Barre) in 2021 about closing the Livingston Pure Barre studio due to the ongoing pandemic, high cost of moving and buildout expense, extensive sales, marketing, payroll costs of re-opening a studio, and the close proximity of other studios. Pure Barre (through Stokes) denied Mr. Zaltsman request and claimed early closure would make Mr. Zaltsman in default of his Pure Barre franchise agreement and all of his Xponential franchise agreements (including the Row House franchise agreements and the Row House ADA).

28. Out of necessity, Mr. Zaltsman then opened a new studio at 519 S. Livingston Ave., Livingston, New Jersey, which, like before, was a saturated market already containing four Pure Barre studios within ten miles of the new location.

**Damages to Zaltsman and his entities**

29. Respondents conduct alleged above has caused significant damage to Zaltsman and his entities that continues to accrue.

30. Regarding the five Row House studios, Mr. Zaltsman will prove economic damages over $1,300,000. This includes, without limitation, recovery for operating losses (over $500,000), losses in fees paid to the franchisor ($125,000), losses in lease payments and/or related lease liability (over $500,000), and losses due to financing needed to support the struggling studios (over $270,000).

31. Regarding the Pure Barre studio, Mr. Zaltsman will prove economic damages over $800,000. This includes, without limitation, recovery for operating losses (over $500,000), losses in fees paid to the franchisor ($60,000), losses in lease payments and/or related lease liability (over $30,000), and losses due to financing needed to support the struggling studio (over $230,000).

### **Xponential should be compelled to arbitrate**

32. Xponential, a nonsignatory to the arbitration agreements, can be compelled to arbitrate because its agents – Row House and Pure Barre – are signatories and agreed to arbitrate.

33. Under "both federal and state law, the threshold question presented by a petition to compel arbitration is whether there is an agreement to arbitrate." *Cruise v. Kroger Co*. (2015) 233 Cal. App. 4th 390, 396 (citing *Cheng-Canindin v. Renaissance Hotel Associates* (1996) 50 Cal.App.4th 676, 683).

34. "In California, the general rule is that arbitration should be upheld unless it can be said with assurance that an arbitration clause is not susceptible to an interpretation covering the asserted dispute." *Id.* (citing Izzi v. Mesquite Country Club (1986) 186 Cal.App.3d 1309, 1315; internal quotations omitted.)

35. "There are circumstances in which nonsignatories to an agreement containing an arbitration clause can be compelled to arbitrate under that agreement. As one authority has stated, there are six theories by which a nonsignatory may be bound to arbitrate: "(a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing or alter ego; (e) estoppel; and (f) third-party beneficiary." " *Cohen v. TNP* 2008 Participating Notes Program, LLC (2019) 31 Cal. App. 5th 840, 859 (quoting *Benaroya v. Willis* (2018) 23 Cal.App.5th 462, 469; internal quotations omitted.).

36. There is no question that Row House and Pure Barre are subsidiaries of Xponential. As alleged in the Demand, Xponential was the sole member of Row House Franchise, LLC and PB Franchising, LLC from 2017 through March 2023. From March 2023 to the present, Xponential is the

sole member of another entity—XPOF Assetco, LLC—which, in turn, is the sole member of Row House Franchise, LLC and PB Franchising LLC. [Exh. C, Amended Arbitration Demand, ¶ 6.)

37. Further evidence that the subsidiaries are mere agents or instrumentalities of Xponential includes (without limitation):

    a. Xponential has the same corporate address as Row House and Pure Barre. See Exh. C, ¶¶ 3-6; and see, *Cohen*, *supra*, 31 Cal. App. 5th at 866 (finding evidence that the entities shared the same address to be evidence of control supporting compelling arbitration of non-signatory parent);

    b. Xponential has repeatedly blurred the lines between itself and its subsidiaries, demonstrating control under Cohen, 31 Cal. App. 5th at 865 (finding the parent sending a letter to its subsidiary's noteholders blurred the lines between the two entities supporting a finding of agency that compelled arbitration of non-signatory parent). For example, and without limitation:

        i. As of (at least) May 16, 2024, Xponential and Row House shared an attorney—Evan Hearnsberger—who, on behalf of Xponential and Row House jointly issued a notice of termination to Zaltsman. [See Exh. D.]

        ii. Marketing materials for Row House presented to Zaltsman during discovery day included marketing for Xponential Fitness. [See Exhibit E, p. 2.]

        iii. Xponential holds itself out as controlling its franchise brands, which includes Row House and Pure Barre.

            1. See its website - https://www.xponential.com/our-brands - under Our brands. [See, Exh. F, identifying Pure Barre as one of Xponential's brands.]

            2. See a May 17, 2024 press release, in which Xponential refers to its portfolio of brands. [See, Exh. G.]

            3. See a November 4, 2024 Consent Order entered between The Commissioner of Financial Protection and Innovation and XPO in which Xponential acknowledges that it is "the direct and indirect parent[] of,

and exercise[s] control over, and own[s] interests in several franchisors…" including Row House and Pure Barre. [See Exh. H, p. 3, ¶ G.]

4. Finally, see a August 6, 2025 Consent Order entered into between The Department of Financial Institutions for the State of Washington and XPO in which Xponential acknowledges its liability for errors and omissions in the Franchise Disclosure Documents for its various brands, including Pure Barre and Row House. [Exh. I, ¶¶ 2, 3, 6-9, 13, 14.]

c. The mandatory binding arbitration clause of the franchise agreements (Section 16.4) is broad enough to include Xponential, as it covers "any claim, dispute, suit, action, controversy, or proceeding of any type whatsoever … between or involving Franchisee and Franchisor on whatever theory and/or facts based and whether or not arising out of this Agreement …". Xponential's significant involvement in the events alleged in the demand are covered by the arbitration clause signed by its subsidiary. *Cohen*, *supra*, 31 Cal. App. 5th at 866 (holding broad arbitration clause supported compelling arbitration of non-signatory parent).

d. The arbitration agreements at issue contain a Third Party Beneficiaries clause that binds Xponential to this arbitration. Section 16.13 states:

**Third Party beneficiaries.** Franchisor's officers, directors, shareholders, agents and/or employees are express third-party beneficiaries of the provisions of this Agreement, including the dispute resolution provisions set forth in this Section 21, each having authority to specifically enforce the right to mediate / arbitrate claims asserted against such person(s) by Franchisee. [Exh. A, p. 36, § 16.13.]

38. When the franchise agreements were signed, Xponential was the sole member of Row House and Pure Barre and therefore can be compelled to arbitrate despite not having signed the agreements because it accepted the benefits of the agreements. Third party beneficiaries, despite being nonsignatories, can be compelled to arbitrate because they benefited from the agreement. See, *NORCAL Mut. Ins. Co. v. Newton* (2000) 84 Cal. App. 4th 64, 76–77 ("In some cases, a nonsignatory was required to arbitrate a claim because a benefit was conferred on the nonsignatory as a result of the contract, making the nonsignatory a third party beneficiary of the arbitration agreement."); and see, *RN*

*Sol., Inc. v. Cath. Healthcare W.* (2008) 165 Cal. App. 4th 1511 (holding a nonsignatory to be bound by the arbitration agreement both as an agent-employee of RNS and as a third party beneficiary of the CHW–RNS recruitment agreement.).

## FIRST CLAIM FOR RELIEF

## COMPEL ARBITRATION UNDER THE FEDERAL ARBITRATION ACT

39. Petitioners repeat and reallege all preceding paragraphs as if fully set forth in this claim for relief.

40. As explained above, Petitioners have demanded arbitration against Xponential and its subsidiary companies pursuant to the franchise agreements between Petitioners and Xponential's wholly owned subsidiaries.

41. A unity of interest, ownership and control exists between Xponential and its wholly owned subsidiaries such that the separate personalities of the entities no longer exist.

42. Failure to disregard the corporate distinction between Xponential and its wholly owned subsidiaries would sanction a fraud and promote injustice.

43. Xponential has refused to participate in that arbitration on the grounds that it is not a signatory to the franchise agreements containing the arbitration clause.

44. By reason of the foregoing, the court should issue an order compelling XPO to participate in the currently-pending arbitration of the dispute between the parties in accordance with the terms of the agreements between Petitioners and XPO's wholly owned subsidiaries.

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioner prays for judgment in its favor:

1. An order compelling Defendant Xponential Fitness, LLC to participate in the now-pending arbitration of Petitioners' claims against its wholly owned and controlled subsidiaries;

2. For reasonable attorneys' fees and costs incurred herein pursuant to the parties' franchise agreements, and;

8. For such other and further relief as the Court may deem just and proper.

Dated: December 11, 2025

**LUTHER LANARD, PC**

By: /s/ S. Ryan Patterson
S. Ryan Patterson
Attorneys for Petitioners